989 F.2d 985
 61 USLW 2608, 26 U.S.P.Q.2d 1378
 GILBERT/ROBINSON, INC., a corporation, Plaintiff-Appellee,
v.
CARRIE BEVERAGE-MISSOURI, INC., a corporation, Defendant-Appellant,
Carrie Beverage Incorporated, a corporation, Defendant.
GILBERT/ROBINSON, INC., a corporation, Plaintiff-Appellant,
v.
CARRIE BEVERAGE-MISSOURI, INC., a corporation, Defendant-Appellee,
Carrie Beverage Incorporated, a corporation, Defendant-Appellee.
 Nos. 91-2869, 91-2877.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 11, 1992.
Decided April 5, 1993.
Rehearing and Rehearing En Banc Denied May 19, 1993.
 
 Thomas C. Walsh, Bryan Cave, St. Louis, MO, for plaintiff-appellant--cross-appellee, Gilbert/Robinson, Inc.
 James Francis Malone, St. Louis, MO, for defendants-appellees--cross-appellants, Carrie Beverage-Missouri, Inc. and Carrie-Beverage, Inc.
 Before LOKEN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and ROSENBAUM,* District Judge.
 LOKEN, Circuit Judge.
 
 
 1
 In this trademark infringement case, plaintiff Gilbert/Robinson, Inc. ("Gilbert"), the trademark owner, appeals a jury verdict awarding infringing defendants Carrie Beverage, Inc., and Carrie Beverage-Missouri, Inc. (collectively, "Carrie"), $3.1 million in compensatory and punitive damages because of Gilbert's fraud on the United States Patent and Trademark Office (the "PTO"). Carrie cross-appeals the district court's grant of a permanent injunction against continued infringement of Gilbert's trademark rights under state law. See Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc., 758 F.Supp. 512, 520 (E.D.Mo.1991). We conclude that Carrie failed to prove actionable fraud on the PTO and reverse the judgment entered upon the jury's verdict. On the cross appeal, we affirm.
 
 I.
 
 2
 In April 1972, Gilbert opened the first HOULIHAN'S OLD PLACE restaurant in Kansas City's Country Club Plaza shopping center. According to contemporary promotional material, Gilbert based the name on the site's previous tenant, Tom Houlihan's Men's Wear store. The restaurant was a success, and over the next four years HOULIHAN'S OLD PLACE restaurants opened in six other cities.
 
 
 3
 Gilbert took early steps to protect its new name. In June 1975, it applied for federal registration of the mark HOULIHAN'S OLD PLACE for restaurant services. In October 1975, it paid a San Diego company $9,500 to abandon the name HOOLIHAN'S 1880 BAR & GRILL; in May 1976, it paid a Houston restaurateur $10,000 to abandon the name HOULAHAN'S. On October 12, 1976, the PTO registered the mark HOULIHAN'S OLD PLACE. On February 5, 1980, the PTO granted Gilbert's 1978 application for registration of a second mark, HOULIHAN'S OLD PLACE AND LOGO.[1]
 
 
 4
 In 1982, Carrie opened MIKE HOULIHAN'S bar in a downtown Milwaukee shopping mall; the name was a combination of the names of Carrie's shareholders, Michael Heyer and John Houlihan. When Carrie opened a second MIKE HOULIHAN'S in Minneapolis in 1984, Gilbert wrote to "insist that the name be changed because of the [federal] registration we have in place." Carrie's Minneapolis bar closed with this issue unresolved.
 
 
 5
 In mid-1985, Carrie opened a MIKE HOULIHAN'S bar at the St. Louis Centre in downtown St. Louis. By this time, Gilbert had fifty-two HOULIHAN'S OLD PLACE restaurants in twenty-two states. Gilbert had operated a HOULIHAN'S OLD PLACE in suburban St. Louis since 1975 and planned to open another in December 1985 in Union Station, a few blocks from St. Louis Centre. The week MIKE HOULIHAN'S opened, Gilbert wrote Carrie to warn that, "[y]our use of Houlihan's in the name of your operation is already causing confusion.... In view of this situation, we hereby inform you that ... we will take all steps to protect our established and legally recognized rights in our Houlihan's name."
 
 
 6
 Gilbert commenced this action in October 1985, alleging that it has the exclusive right to use the federally registered HOULIHAN'S OLD PLACE marks, and that Carrie's infringing use of the name MIKE HOULIHAN'S violates federal and state trademark law and constitutes unfair competition under Missouri common law. Gilbert sought an injunction, compensatory and punitive damages, and attorney's fees.
 
 
 7
 During discovery, Carrie learned that, when Gilbert submitted its first registration application to the PTO in 1976, the PTO examiner responded with the following inquiry:
 
 
 8
 The name ... on the drawing should be identified. If it is the name ... of a particular living individual, a written consent from said individual to the use and registration of the name ... must be filed. Section 2(c) of the trademark act; TMEP section 1204.[2]
 
 
 9
 Although Kansas City clothier Tom Houlihan was alive at this time (he died on December 4, 1976), Gilbert responded through its patent counsel that, "The name in the mark is fictitious and is not a reference to any living individual." Armed with these facts, Carrie now asserted a counterclaim, alleging that Gilbert had procured its 1976 and 1980 registrations by fraudulent declarations to the PTO, and seeking to recover damages under Section 38 of the Lanham Act, 15 U.S.C. § 1120.
 
 
 10
 The district court bifurcated the parties' claims and tried Carrie's counterclaim first to a jury. At trial, Carrie presented evidence tending to prove that Gilbert's response to the PTO examiner's inquiry was an intentional nondisclosure. Carrie's experts further opined that Gilbert's 1976 registration would not have issued without Tom Houlihan's consent had the facts been disclosed to the PTO, and that Gilbert's 1980 registration was tainted by the fraud because it was dependent upon Gilbert's ownership of the 1976 registration. For damages, Carrie presented evidence that Gilbert's infringement suit scuttled plans for a nationwide expansion of MIKE HOULIHAN'S restaurants backed by $750,000 of venture capital.
 
 
 11
 The jury found that Gilbert's 1976 and 1980 registrations were procured by fraud and awarded the two Carrie corporations a total of $1.1 million in compensatory damages for Carrie's lost business opportunity and litigation expenses, plus $2 million in punitive damages.[3] Based upon the jury verdict, the district court dismissed Gilbert's Lanham Act infringement claims and then conducted a two-day bench trial on Gilbert's state law claims. The court concluded that, independent of any federal registration, Gilbert "has acquired trademark rights in [the HOULIHAN'S] name," which is "a fictitious, arbitrary or fanciful mark ... entitled to the widest ambit of protection." 758 F.Supp. at 525. The district court entered judgment in favor of Gilbert on its state statutory and common law claims and permanently enjoined Carrie from using the MIKE HOULIHAN'S name in Missouri. Both sides timely appealed.
 
 II.
 
 12
 Section 2(c) of the Lanham Act, 15 U.S.C. § 1052(c), provides that a trademark is not registrable if it "Consists of or comprises a name, portrait, or signature identifying a particular living individual except by his written consent...." This section is intended to protect rights of privacy and proprietorship, not of all persons who bear a particular name, but of those who "will be associated with the mark as used on the goods, either because that person is so well known that the public would reasonably assume the connection or because the individual is publicly connected with the business in which the mark is used." Martin v. Carter Hawley Hale Stores, Inc., 206 U.S.P.Q. 931, 933 (T.T.A.B.1979).
 
 
 13
 At the time of Gilbert's 1976 application, the TMEP provided the following guidance to trademark applicants and examining attorneys concerning compliance with § 1052(c):
 
 
 14
 § 1204.01. If a mark appears to be matter which identifies a particular individual ... and no explanation or consent is of record, the Examining Attorney must inquire whether or not the matter identifies a particular individual.... In the event the matter does not identify a particular living individual, it is satisfactory if in response it is stated that the matter does not identify any particular living individual, or that it is fanciful, or the like, but it is desirable that in addition any special circumstances which exist be explained....
 
 
 15
 § 1204.03. If the mark or a part of it gives the appearance of identifying a particular individual, but it was devised by the applicant as fanciful, or applicant believes it to be fanciful, a statement to that effect must be put in the record.
 
 
 16
 If it should nevertheless develop that the matter is the name of some particular living individual, requirement for consent depends upon determination of whether the mark would be recognized and understood by the public as identifying the person. If the person is not generally known, nor well known in the field relating to the goods concerned, it may be that the mark would not constitute the identification of a particular person under this section, and in such event consent would not be required.
 
 
 17
 Carrie's claim of fraud is based upon Gilbert's failure to disclose Tom Houlihan in responding to the examiner's § 1052(c) inquiry.
 
 
 18
 The Lanham Act has numerous remedial provisions that may apply when a registration is improperly obtained. First, a person "damaged by the registration" may petition to have the registration cancelled "at any time if the registered mark ... was obtained fraudulently or contrary to the provisions of" § 1052(c). 15 U.S.C. § 1064(c). Second, in an infringement suit, fraudulent procurement of the mark or a violation of § 1052(c) is a defense to the "incontestability" of a registered mark. See 15 U.S.C. §§ 1065, 1115(b)(1). Third is the remedy invoked by Carrie--a damage action under 15 U.S.C. § 1120, which provides that:
 
 
 19
 Any person who shall procure registration ... by a false or fraudulent declaration ... shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof.
 
 
 20
 For purposes of this appeal, we accept the jury's finding that Gilbert intentionally withheld relevant information about Tom Houlihan in responding to the PTO's § 1052(c) inquiry, although the issue is not free of doubt given the provisions of TMEP § 1204.03. We conclude that Carrie nonetheless failed to prove an actionable violation of § 1120 as a matter of law.
 
 
 21
 A. Standing and Causation.
 
 
 22
 A § 1120 plaintiff may recover "damages sustained in consequence of" a registration procured by a fraudulent declaration. Carrie failed to prove that it was injured "in consequence of" a fraudulently procured registration for three distinct reasons.
 
 
 23
 First, Carrie failed to prove a cognizable Lanham Act injury. Section 1052(c) exists to protect the privacy and property interests of persons whom the public will associate with a mark. Carrie is not in privity with Tom Houlihan and has no standing to vindicate his rights. See Capetola v. Orlando, 426 F.Supp. 616, 617-18 (E.D.Pa.1977) (infringer has no standing to seek cancellation of a mark based upon lack of a third party's consent under § 1052(c)); Jones & Laughlin Steel Corp. v. Jones Engineering Co., 292 F.2d 294, 296 (C.C.P.A.1961) (trademark "opposer has no standing to assert damage to itself because of third party rights").
 
 
 24
 Moreover, even if Carrie could assert Tom Houlihan's § 1052(c) rights, it has failed to establish that Lanham Act relief is warranted. The district court found that Gilbert's fanciful mark is, by reason of its use in the marketplace, now "entitled to the widest ambit of protection." The Lanham Act's dominant interest in preventing consumer confusion argues strongly against rendering a registered mark unenforceable based upon a third party's long-expired § 1052(c) rights. See Rick v. Buchansky, 609 F.Supp. 1522, 1539 (S.D.N.Y.1985), and cases cited (only strong proof of damages from a § 1052(c) violation will warrant cancellation of a mark). As the Supreme Court cautioned in Beckwith v. Commissioner of Patents, 252 U.S. 538, 546, 40 S.Ct. 414, 417, 64 L.Ed. 705 (1920), one who has gained rights in a mark by its use in commerce is entitled to a "fair, even liberal, construction of" the registration provisions of federal law.
 
 
 25
 Carrie disclaims reliance on § 1052(c) and emphasizes that its counterclaim is based upon Gilbert's fraud on the PTO. But Carrie did not exist in 1976, when the fraud occurred, so it was not immediately injured by the fact that Gilbert's mark was registered. Nor has Carrie proved that registration fostered either consumer confusion or unfair competition at that time.[4] Carrie's injury arose many years later and is attributable to Gilbert's prior right to employ the HOULIHAN'S name in this line of business, a right established by Gilbert's longstanding use. This injury is not within the zone of interests that § 1120 was intended to protect. Indeed, the Lanham Act's purpose of preventing consumer confusion favors resolving infringement disputes on the merits. Therefore, § 1120 should not be invoked to block Lanham Act enforcement of Gilbert's marks based upon an ancient nondisclosure to the PTO that has no bearing on whether Gilbert today has a superior right to use the marks in commerce.
 
 
 26
 By way of analogy, we note that the federal antitrust laws provide a damage action to a person "injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. In the leading case of Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 698, 50 L.Ed.2d 701 (1977), the Supreme Court held that an antitrust plaintiff "must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Like the antitrust laws, the Lanham Act seeks to promote a fair and efficient marketplace, and it is therefore not surprising that this same concept has shaped judicial application of Lanham Act remedies. For example, in dismissing an action seeking § 1120 damages on account of fraudulent failure to obtain a § 1052(c) consent, the court in Jackson v. Lynley Designs, Inc., 729 F.Supp. 498, 500-01 (E.D.La.1990), commented:
 
 
 27
 But it is not enough for the plaintiff merely to establish fraud in the registration of the trademark.... [S]he must also show that she sustained some damage in consequence of the fraud; she must indicate an offense to a protected interest.... Without a cognizable injury, plaintiff lacks standing to maintain this action.
 
 
 28
 Second, Carrie failed to prove that its injury was caused by Gilbert's registration of the HOULIHAN'S OLD PLACE marks. Carrie's damage claims--for its costs of defense[5] and the loss of potential financing for expansion--were based upon Gilbert's claims of infringement. Gilbert presented uncontradicted evidence of prior use; Carrie proved fraud in the 1976 registration process.
 
 
 29
 "Unlike the registration of a patent, a trademark registration of itself does not create the underlying right to exclude. Nor is a trademark created by registration. While federal registration triggers certain substantive and procedural rights, the absence of federal registration does not unleash the mark to public use. The Lanham Act protects unregistered marks as does the common law." San Juan Prods., Inc. v. San Juan Pools, Inc., 849 F.2d 468, 474 (10th Cir.1988) (citation omitted) (emphasis in original); see Country Mut. Ins. Co. v. American Farm Bureau Fed'n, 876 F.2d 599, 600-01 (7th Cir.1989). Thus, even without its registrations, Gilbert still would have had a substantially similar Lanham Act cause of action and an identical state law claim for infringement and unfair competition. See Co-Rect Prods., Inc. v. Marvy! Advertising Photography, Inc., 780 F.2d 1324, 1329 (8th Cir.1985); Goya Foods Inc. v. Tropicana Prods., Inc., 846 F.2d 848, 854 (2d Cir.1988).
 
 
 30
 Carrie argues that, under our decision in Landstrom, 189 F.2d at 50, Gilbert is liable for § 1120 damages because it took substantial affirmative action to enforce its false registration. However, the fraud on the PTO in Landstrom was the willful failure to disclose another user's established rights in the name. That fraud directly affected the registration holder's underlying use-based trademark right. No case has allowed an infringer to recover, as § 1120 damages, losses attributable to the trademark owner's enforcement of a valid mark because the owner enhanced its rights by a fraudulently procured registration.
 
 
 31
 We conclude that such damages may not be recovered under § 1120. Since Gilbert's registration, even if fraudulently procured, was consistent with and did not disturb its underlying trademark rights acquired through thirteen years of use of the mark in commerce, Carrie's injury--its exposure to infringement litigation and liability--was not "in consequence of" Gilbert's fraudulent declaration to the PTO in 1976. To recover for this type of injury under § 1120, an infringer must prove that the registration holder has no right to exclusive use of the mark allegedly infringed, in addition to proving that the registration was fraudulently procured.
 
 
 32
 Third, we conclude that Carrie's injury was not proximately caused by Gilbert's 1976 fraud on the PTO because of Gilbert's 1980 registration of a second HOULIHAN'S OLD PLACE mark. When Gilbert applied for registration of its second mark two years after Tom Houlihan's death, § 1052(c) was no longer an issue because it "does not apply to deceased persons." TMEP § 1204. The PTO registered that mark in 1980, and it was a basis for Gilbert's Lanham Act infringement claim against Carrie.
 
 
 33
 Carrie's expert witness, a former PTO assistant commissioner, testified that the fraudulently procured 1976 registration was of "critical" importance to the 1980 registration because, "absent the concept of common ownership," the first registration would have blocked registration of the second mark. But that ignores the statutory scheme. A fraudulently procured registration is subject to cancellation under § 1064(c); in other words, the statute treats it as a nullity. If Gilbert's 1976 registration had been cancelled as fraudulently procured, the PTO would have issued the 1980 registration because Gilbert had established its right to use the mark in commerce and, with Tom Houlihan's death, the mark no longer referred to a particular living individual.
 
 
 34
 Carrie would have us go beyond the Lanham Act's cancellation remedy and keep the 1976 registration alive for purposes of tainting the otherwise unimpeachable 1980 registration. We will not imply such an extreme remedy into the Lanham Act's carefully constructed remedial scheme, particularly so as to create a windfall benefit for an infringer who was not in business at the time of the initial fraud and has no interest in the underlying § 1052(c) issue. Thus, Gilbert's 1980 registration is valid and is a superseding cause of any infringement liability injury sustained by Carrie in 1985 and later years.
 
 
 35
 B. Materiality.
 
 
 36
 We also conclude that Carrie failed to prove that Gilbert's fraudulent nondisclosure to the PTO was material. The district court defined a material nondisclosure as one involving information the PTO would have considered significant in deciding whether to grant registration. This was error. To recover under § 1120 for the injury alleged by Carrie, the infringer must prove that the mark would not have been registered absent the fraud. This is an issue for the court.
 
 
 37
 Although the issue has not previously arisen in trademark cases, patent law provides a useful frame of reference. In patent infringement cases, it is an equitable defense to enforcement of the patent that the applicant failed to disclose "material" information to the PTO, that is, information that a reasonable examiner would have considered important in deciding whether to issue the patent. See In re Jerabek, 789 F.2d 886, 890 (Fed.Cir.1986). On the other hand, to warrant damages for a fraudulently procured patent, the plaintiff must prove that the patent "would not have issued but for the misrepresentation or non-disclosure." E.I. du Pont de Nemours & Co. v. Berkley & Co., 620 F.2d 1247, 1274 (8th Cir.1980).
 
 
 38
 This distinction is particularly appropriate in trademark cases because the owner's right to use and enforce a mark does not depend upon registration. See page 1000, supra. If the mark would have been registered regardless of the fraud, it would frustrate the purposes of the Lanham Act to allow an infringer to escape the consequences of its infringing activity on account of the fraud.
 
 
 39
 This principle defeats Carrie's § 1120 damage claim. In responding to the PTO's March 1976 inquiry, if Gilbert had disclosed that Tom Houlihan was alive and his relationship to the first Houlihan's Old Place restaurant, it is problematic whether the PTO examiner would have required Gilbert to obtain Tom Houlihan's consent under TMEP § 1204. Though some members of the local community no doubt associated the restaurant site with Tom Houlihan, he was not generally known beyond Kansas City, and he was not known at all in the restaurant field in which Gilbert sought registration. This close question must be answered before Carrie may recover § 1120 damages, and it is not a question for the jury. Because the Lanham Act provides that the court must "determine the right to registration," 15 U.S.C. § 1119, this aspect of materiality must be decided by the court before a § 1120 damage claim is submitted to the jury.
 
 
 40
 In this case, however, we need not decide whether a fully informed PTO examiner would have registered the mark in October 1976 without Tom Houlihan's consent because, in any event, Gilbert's mark would have been registered long before Carrie commenced its infringing use. Either Gilbert would have obtained Tom Houlihan's consent, or it would have refiled without consent after Tom Houlihan's death in December 1976 eliminated the § 1052(c) issue. Therefore, the fraudulent nondisclosure did not affect whether Gilbert's mark would be registered and was not material, as a matter of law, for purposes of Carrie's § 1120 damage claim.[6]
 
 III.
 
 41
 In its cross appeal, Carrie argues that the district court abused its discretion in retaining pendent jurisdiction to try Gilbert's state law and common law claims. We disagree. Under 28 U.S.C. § 1338(b), the district court had pendent jurisdiction over "any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the ... trademark laws." Three business days before the scheduled start of the bench trial, Carrie asserted for the first time that "exercise of pendent jurisdiction is improper." The district court denied that motion, noting that it was untimely and that completion of the bench trial would avoid inconvenience, duplicative preparation, piecemeal litigation, and separate appeals.
 
 
 42
 In United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), the Supreme Court confirmed that "pendent jurisdiction is a doctrine of discretion" whose exercise "lies in considerations of judicial economy, convenience and fairness to litigants." Here, such considerations clearly support the district court's ruling. Carrie filed its motion too late to prevent the general expense of preparing for trial. Moreover, the district court had conducted a jury trial and presided over three and a half years of proceedings on other issues derived from the same nucleus of facts. We have frequently observed that, "the substantial investment of judicial time and resources in the case ... justifies the exercise of jurisdiction over the state claim, even after the federal claim has been dismissed." North Dakota v. Merchants Nat'l Bank & Trust Co., 634 F.2d 368, 371 (8th Cir.1980) (en banc); see First Nat'l Bank & Trust Co. v. Hollingsworth, 931 F.2d 1295, 1308 (8th Cir.1991); Federal Prescription Serv., Inc. v. Amalgamated Meat Cutters, 527 F.2d 269, 274 (8th Cir.1975).
 
 
 43
 Carrie also argues that the district court erred in refusing to cancel Gilbert's fraudulently procured registrations under 15 U.S.C. § 1119, asserting that cancellation is required so as not to "condone" the fraud and permit Gilbert to reap its benefits. Cancellation is a discretionary matter for the district court. Because the 1976 registration no longer violates § 1052(c), because the 1980 registration never did, and particularly because Gilbert retains the underlying right to use the marks in commerce, the district court was well within its discretion in declining to cancel the registrations. Indeed, preserving these registrations furthers the Lanham Act's dominant purpose of protecting consumers from confusion in the marketplace. See Bongrain Int'l Corp. v. Delice de France, Inc., 811 F.2d 1479, 1485 (Fed.Cir.1987) (contrary to policy and purposes of Lanham Act to cancel registrations "if they may be preserved without clear violation of the statute").
 
 
 44
 The other issues raised by Carrie on the cross appeal are without merit. We agree with the district court that Gilbert has standing to pursue its infringement claims. See 758 F.Supp. at 528; 15 U.S.C. §§ 1055, 1127. Carrie's remaining arguments cannot survive our conclusion that the jury verdict must be reversed as a matter of law. In addition, the jury verdict affords Carrie no absolute defense to Gilbert's state law infringement and unfair competition claims. See Republic Molding Corp. v. B.W. Photo Utils., 319 F.2d 347, 350 (9th Cir.1963).
 
 IV.
 
 45
 For the foregoing reasons, the September 29, 1987, judgment of the district court is reversed and the case is remanded with instructions to dismiss Carrie's counterclaim with prejudice. The February 28, 1991, judgment of the district court is affirmed.
 
 
 
 *
 The HONORABLE JAMES M. ROSENBAUM, United States District Judge for the District of Minnesota, sitting by designation
 
 
 [1]
 The marks at issue in this case are service marks, rather than trademarks, because they identify restaurant services as opposed to tangible goods. Trademark law treats trademarks and service marks the same. See 15 U.S.C. § 1053. This opinion will use the more common terms, mark or trademark
 
 
 [2]
 The TMEP is the Trademark Manual of Examining Procedure. Section 1204, which is discussed at page 998, infra, is § 1206 in the most recent 1986 edition of the TMEP
 
 
 [3]
 The award of punitive damages is contrary to controlling law in this circuit. See Landstrom v. Thorpe, 189 F.2d 46, 52-53 (8th Cir.), cert. denied, 342 U.S. 819, 72 S.Ct. 37, 96 L.Ed. 620 (1951). Remedies for fraud on the PTO are a matter of federal law, and the Lanham Act's "meticulously detailed" remedial provisions preclude award of this extrastatutory remedy. Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 719, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475 (1967)
 
 
 [4]
 This might not always be the case. If two competitors seek to register confusingly similar marks consisting of a third person's name, and one obtains a prior registration by fraudulently concealing its failure to obtain the third party's consent, the second would be directly injured by the fraud
 
 
 [5]
 We doubt whether infringement defense costs may be recovered under § 1120. See Wrist-Rocket Mfg. Co. v. Saunders Archery Co., 578 F.2d 727, 734 (8th Cir.1978); Blue Bell, Inc. v. Jaymar-Ruby, Inc., 497 F.2d 433, 439 (2d Cir.1974). The statute allows attorneys fees to be awarded to the "prevailing party" in an infringement suit in exceptional cases. 15 U.S.C. § 1117. A § 1120 damage claim may not supplant the court's carefully circumscribed discretion to award fees under § 1117. Cf. Louis Ender, Inc. v. General Foods Corp., 467 F.2d 327, 330-31 (2d Cir.1972), cert. denied, 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973) (cost of defending trademark owner's unfair competition claim in state court not recoverable under § 1120)
 
 
 [6]
 As the Jerabek and du Pont cases illustrate, our ruling leaves open the question whether Carrie (or another infringer) could use Gilbert's 1976 fraud as a defense to Lanham Act infringement claims. That question is not before us because Gilbert did not appeal the district court's order dismissing its Lanham Act claim based upon the jury's fraud determination. Because the district court did not sufficiently analyze whether this ruling was consistent with the Lanham Act's broad public purposes, it should not be afforded res judicata or collateral estoppel effect in any future litigation involving Gilbert's marks