**MARIO VALENTE COLLEZIONI, LTD., Plaintiff,**

v.

**CONFEZIONI SEMERARO PAOLO, S.R.L., et al., Defendants.**

**No. 97 Civ.2008(LAK).**

United States District Court, S.D. New York.

Sept. 8, 2000.

Daniel H. Greenberg, New York, NY, for plaintiff.

Kim Steven Juhase, Steven Rondos, RAIA & Rondos, New York, NY, for defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

This is an action by Mario Valente Collezioni, Ltd., a designer, importer and wholesaler of men's overcoats, against Semeraro Paolo, an Italian citizen who personally does business under the name Confezioni Semeraro Paolo, S.R.L. ("CSP"), and his Italian company, Confezioni Mario Valente—Firenze, S.R.L. ("CMV"). The matter now is before the Court on the defendants' motion, pursuant to Rules 55(c) and 60(b), to vacate their default and the default judgment entered against them, and on plaintiff's cross-motions to amend the name of one of the defendants in the judgment and to condition any opening of the defaults on defendants' posting a bond.

### I

*The Prior Proceedings*

Plaintiff brought this action in 1997 for breach of contract, trademark infringement and unfair competition. The summons and complaint concededly were served on the defendants in March 1997 by three independent means. They were served personally on Semeraro in Italy by a Ms. Jenkner on March 25, 1997. A second set of copies was delivered by Federal Express on March 28, 1997. A third was sent on March 31, 1997 by the Clerk of the Court by certified mail. Defendants nonetheless defaulted, although they commenced an action against plaintiff in an Italian court on April 8, 1997.

On September 23, 1997, no appearance having been entered by any of the defendants, this Court granted plaintiff's application for a default judgment and referred the matter to Magistrate Judge Douglas F. Eaton for an inquest.[1] On October 27, 1997, Magistrate Judge Eaton entered an order requiring plaintiff to submit its proof, directing defendants to submit opposing papers no later than December 29, 1997, and setting January 21, 1998 for a hearing if a hearing were requested by any party.[2] The inquest was held on that date although defendants did not appear or file any papers.

Following the inquest, Magistrate Judge Eaton issued a report and recommendation, dated March 23, 1998, recommending that plaintiff be awarded damages totaling $1,645,970 plus interest. Defendants concededly received that report and recommendation.[3] Nevertheless, they filed no objections and, on April 10, 1998, the Court entered judgment for plaintiff in the amount of $1,693,387.62.[4]

On April 22, 1998, the Court received a letter from Avv. Alessandro Mele, an Italian attorney representing defendants, in which Avv. Mele claimed that his clients first learned of this action when it received Magistrate Judge Eaton's March 1998 report and recommendation, broadly denied plaintiff's allegations, stated that defendants would "assert [their] rights firmly in front of the Italian Judge in case of a possible enforcement of the foreign judgement [*sic* ]," and requested that this Court "revise his decisions." [5] On April 24, 1998, this Court entered an order providing in relevant part as follows:

> "Only attorneys admitted to practice in this Court may appear on behalf of litigants. In consequence, the submission by Italian counsel cannot be considered. Further, as final judgment now has been entered, it would appear that the defendants' recourse, assuming they wish to contest the matter in the United States, is either to move for relief from the judgment pursuant to Rule 60 of the Federal Rules of Civil Procedure or to seek such relief by independent action." [6]

Although thus advised in no uncertain terms of what would be required to contest the default judgment in the United States, defendants did nothing for a protracted period.

In the meantime, plaintiff in October 1998 commenced a proceeding in the Court of Appeals of Bari, Italy, for recognition of this Court's judgment.[7] Defendants defaulted there as well and, on January 26, 1999, that court recognized and registered the judgment, thus enabling plaintiff to enforce it there.[8]

At that point, defendants came to life. On March 24, 1999, they filed the present motion in this Court and at some unspecified time took steps in Italy in an effort to obtain a stay or other relief with respect to enforcement of the Italian judgment.[9]

*The Explanations for Defendants' Default Here*

Defendants have sought to explain their original default in this action, although

1. Docket Items 8–9.

2. Docket Item 10.

3. Semeraro Aff., Feb. 15, *1999*, ¶ 7 (Docket Item 22); Mele submission, at 2 (Docket Item 16).

4. Docket Item 15. The difference in amount between the report and recommendation and the judgment is attributable to the Court's adoption of a slightly different interest calculation.

5. Docket Item 16.

6. Docket Item 17.

7. J. Selig Aff., July 5, 1999, ¶ 7 (Docket Item 29).

8. *Id.*

The Court is advised that the Italian Court of Appeals on May 11, 2000 declined to reverse the judgment rendering the judgment of this Court enforceable in Italy.

9. *Id.* ¶ 10; Greenberg Aff., July 8, 1999, ¶ 12 (Docket Item 29).

they have offered no justification for the eleven month delay from the denial of Avv. Mele's application until the filing of this motion. Their explanation of the default in responding to this action, however, has much in common with the old weather proverb: if you don't like the explanation, just wait a while—it will change.

The first explanation was that defendants did not know about the lawsuit at all until Magistrate Judge Eaton's report and recommendation following the 1998 inquest. Avv. Mele's April 1998 letter to the Court claimed that his "clients were informed about the pending suit at their expense in the USA only after the preliminary statement [report and recommendation] signed by Judge Douglas F. Eaton, notified by mail the 30th of March 1998." [10]

By the time defendants filed the present motion to vacate the default judgment, however, they had retained U.S. counsel who presumably found the proof of personal service on Semeraro in the court file. Semeraro's first affidavit therefore acknowledged that he had been served in March 1997, but claimed that he did not understand the papers, assumed that they were of no importance, and so did nothing:

> "5. In March, 1997, I was personally handed what I came to learn was the summons and complaint by a woman I knew named Christina Jenker [*sic*]. She did not explain to me what the papers were, but she handed them to me and left. Subsequently, I received additional copies by mail or Federal Express. The documents were all in English and there was no cover letter in Italian explaining the papers. I would occasionally receive papers and letters in English. *Since I did not understand them, I would just file the papers away thinking that if the papers were important, the person sending them to me would give me the courtesy of contacting me in Italian*....
>
> "6. At the time I received the aforementioned documents, there was an ongoing unrelated dispute between the parties in Italy. *I assumed* that the papers were just correspondence and documents from the plaintiff's attorney regarding the Italian litigation. I had no idea that the papers were a summons and complaint attempting to force the defendants to appear in America.
>
> "7. *I first became aware that the papers were of some importance in March, 1998 when I received the preliminary statement [report and recommendation] signed by Magistrate Judge Douglas Eaton.*" [11]

This explanation too, however, fell by the wayside.

At the January 21, 1998 inquest before Magistrate Judge Eaton, plaintiff had offered in evidence a *May 15, 1997* letter from Avv. Mele, defendants' Italian counsel, to plaintiff's Italian attorney. The letter read, in relevant part:

> "2) Referring to the summons received from the U.S.A., my Customer [defendants] has entrusted a lawyer in New York with the task to ascertain preliminarily the position of the Company and of the mark in the U.S.A., and to verify the captious demand of the opposing party with all the consequences regarding damages caused and to be caused by your Customer [plaintiff]." [12]

It thus showed that Semeraro (1) did not "just file away" the papers he had received from Ms. Jenkner and by other means, (2) knew they were a summons and complaint in a U.S. lawsuit seeking damages, and (3) both gave them to his Italian counsel and retained New York counsel no later than May 15, 1997. It suggested further that Avv. Mele's April 1998 letter to this Court falsely represented that his clients learned of this case "only" after Magistrate Judge

10. Docket Item 16, at 2.

11. Semeraro Aff., Feb. 15, 1999, ¶¶ 5–7 (Docket Item 22) (emphasis added).

12. PX 36 (copy attached to Greenberg Aff., July 8, 1999 (Docket Item 29)).

Eaton's March 30, 1998 report and recommendation.

Plaintiff pointed all of this out in its papers in opposition to the motion to vacate the default judgment.[13] Not surprisingly, defendants again changed their story. In an August 27, 1999 affidavit, Semeraro withdrew his prior contention that he had just filed away the summons and complaint, admitted that he had delivered those papers to Avv. Mele in May 1997, and stated that he had retained the New York law firm of Kenyon & Kenyon to advise with respect to the Mario Valente trademark.[14] He added that "[r]elying upon the advice of counsel [presumably Avv. Mele] it did not appear that any other action needed to be taken by the Defendant, especially since no transactions took place in New York. I still cannot believe that a country which had no connection with a transaction can have jurisdiction over me."[15] For his part, Avv. Mele admitted that Semeraro had brought him the summons and complaint on May 13, 1997.[16] He added that he believed that the issues "could not be considered by a court of the United States," essentially on jurisdictional grounds,[17] that he thought that the 20 day period afforded for response to the summons and complaint "was inadequate and illegal,"[18] and that he "believed nothing further could be accomplished" because the 20 day period already had expired.[19]

Thus, even viewing the evidence in the light most favorable to the defendants, the record shows that they were fully aware of the action and its implications at least as early as May 13, 1997, that, based on erroneous advice from their Italian lawyer, they deliberately took no action to appear or defend it until Avv. Mele's April 1998 letter, and that they deliberately took no action for eleven months thereafter despite having been advised by the Court that the appropriate course was to retain counsel admitted to practice here and seek relief from the judgment by appropriate means. Moreover, even assuming *arguendo* that the latest version of the story is accurate, Semeraro and Avv. Mele admittedly offered wildly inaccurate explanations of the original default in an effort to vacate the judgment.

## II

By report and recommendation dated November 19, 1999, Magistrate Judge Eaton recommended denial of defendants' motion to vacate the judgment on two alternative grounds: (1) the motion was not made within a reasonable time and, in any case, (2) the judgment is valid and the criteria for vacating a valid judgment have not been satisfied. Defendants object on the grounds that (1) the service upon them of an untranslated summons and complaint violated their light to due process of law, (2) Semeraro and CSP are not subject to personal jurisdiction in this Court, and (3) the criteria for vacating a valid judgment have been satisfied.

Rule 60(b) of the Federal Rules of Civil Procedure provides in relevant part:

> "On motion and upon such terms as are just, the court may relieve a party ... from a final judgment ... for the following reasons: (1) mistake, inadver-

13. Greenberg Aff., July 8, 1999, ¶ 5 (Docket Item 29).

14. Semeraro Aff., Aug. 27, 1999, ¶ 10 (Docket Item 35).

In fairness to Kenyon & Kenyon, there is no evidence to suggest that it was aware of this lawsuit. The evidence before the Court suggests only that defendants consulted it concerning registration of Mario Valente as a trademark.

15. *Id.*

16. Mele Aff., Aug. 25, 1999, ¶ 10 (Docket Item 35).

17. *Id.* ¶ 3.

18. *Id.* ¶ 5.

19. *Id.* ¶ 1.

He made no attempt to reconcile this contention with his April 1998 letter, which came still later.

tence, surprise, or excusable neglect; ... (4) the judgment is void; ... or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment ... was entered or taken."[20]

Defendants seek relief pursuant to Rules 60(b)(1), 60(b)(4) and 60(b)(6).[21] It is well established that a judgment rendered in the absence of personal jurisdiction is void and subject to attack under Rule 60(b)(4) without limit of time.[22] In consequence, the Court first must deal with so much of the motion as seeks to vacate the judgment as against Semeraro and CSP for lack of personal jurisdiction, of which the contention relating to service of untranslated documents is a part,[23] on its merits even if their default was willful and their delay in seeking to vacate it inexcusable.

*Personal Jurisdiction*

*A. Untranslated Documents*

■ The report and recommendation of Judge Eaton amply demonstrates that the service of untranslated summonses and complaints upon the defendants, in the circumstances of this case, raises no substantial constitutional question. Without unduly prolonging this discussion, it is conceded that Semeraro immediately brought the papers to his English-speaking Italian attorney who correctly discerned that the defendants were being sued for damages in the United States. The defendants therefore had notice of the pendency of the action and an opportunity to respond. There is no constitutional infirmity here, whatever might be the case in other circumstances.

*B. Personal Jurisdiction Over Semeraro and CSP*

The judgment that is the subject of this motion awarded damages against the defendants, jointly and severally, in the amounts of $661,470 on the first claim, which was for breach of contract, and $984,500 on the second and fourth claims, which were for trademark infringement and unfair competition. The jurisdictional analysis, which focuses entirely on the New York long-arm statute, CPLR § 302,[24] therefore is confined to those claims.

Section 302(a) of the CPLR provides in relevant part that:

"As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent:

"(1). transacts any business within the state or contracts anywhere to supply goods or services in the state; or

"2. commits a tortious act within the state ...; or

"3. commits a tortious act without the state causing injury to person or property within the state ... if he

"(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

"(ii) expects or should reasonably expect the act to have consequences in the

20. FED.R.CIV.P. 60(b).

21. Def.Mem. 4 (Docket Item 23).

22. *See, e.g., Sea-Land Service, Inc. v. Ceramica Europa II, Inc.,* 160 F.3d 849, 852 (1st Cir. 1998); *Covington Indust., Inc. v. Resintex A. G.,* 629 F.2d 730, 733 n. 3 (2d Cir.1980); *Kao Hwa Shipping Co., S.A. v. China Steel Corp.,* 816 F.Supp. 910, 913 (S.D.N.Y.1993); *see also* 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER AND MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2862 at 324; § 2866 at 382 (2d ed.1995).

23. The question is whether service of untranslated documents complies with the due process requirement that a defendant be subjected to personal jurisdiction only after receiving "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Greene v. Lindsey,* 456 U.S. 444, 449–50, 102 S.Ct. 1874, 72 L.Ed.2d 249 (1982) (internal quotation omitted).

24. N.Y.CPLR § 302 (McKinney 1990).

state and derives substantial revenue from interstate or international commerce...."

1. *Tort Claims*

The second and fourth claims quite plainly allege torts.[25] Plaintiff is based in and therefore felt any injury in New York. Hence, if Semeraro and CSP, or their agents, committed any tortious act in New York, they are subject to jurisdiction in accordance with CPLR § 302(a), subd. 2. Similarly, if they committed any tortious act outside the state and satisfied its other requirements, they are subject to jurisdiction under CPLR § 302(a), subd. 3.

The plaintiff submitted evidence at the inquest to the effect that Semeraro, who is the sole owner of CMV and the sole proprietor of CSP,[26] sent representatives of AAK Ltd. ("AAK"), a United Kingdom company the chairman of which is Maurice Kindler, to New York to tell plaintiff's customers that Kindler had taken over the Mario Valente label in the United States and that plaintiff was out of business, thus costing plaintiff at least two major accounts.[27] In short, they allegedly cut plaintiff out of the business, leading Magistrate Judge Eaton to find that "the defendants participated in infringement of plaintiff's trade-name and in unfair competition with the intention of damaging plaintiff." [28] He recommended a large damage award based entirely on the loss by plaintiff of its Lord & Taylor and Bloomingdale's accounts as a consequence of what he found to be tortious behavior attributable to defendants.[29]

Defendants respond to these allegations and findings by claiming that (1) "Mario Valente" is not a registered trademark and therefore is not protected, (2) defendants never sold goods in the United States under the "Mario Valente" name, and (3) defendants could not prevent third parties to whom CMV sold "Mario Valente" coats in Europe from reselling in the United States.[30]

Defendants' first point is entirely without merit. Both the common law and the Lanham Act protect trademarks and trade names irrespective of whether they are registered.[31] The more difficult question is whether Semeraro is subject to long arm jurisdiction in New York on these claims. And it is essential to define the record on which that question must be decided, as it differs in important respects from that which was before the Magistrate Judge.

Upon reviewing the papers in support of and in opposition to the motion to vacate the default judgment, this Court concluded that an evidentiary hearing on the jurisdictional issue raised by Semeraro and CSP was appropriate and subsequently conducted a hearing over parts of three days. Accordingly, the record that controls determination of the jurisdictional issue is that of the evidentiary hearing on the motion rather than the inquest that followed

25. *See, e.g., College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.,* 527 U.S. 666, 119 S.Ct. 2219, 2225, 144 L.Ed.2d 605 (1999) (unfair competition); *Janmark, Inc. v. Reidy,* 132 F.3d 1200, 1202–03 (7th Cir.1997) (trademark infringement); *Car-Freshner Corp. v. Broadway Mfg. Co.,* 337 F.Supp. 618, 619 (S.D.N.Y.1971) (both).

26. CSP is a sole proprietorship, not a legal entity. Objections to Report and Recommendation ¶ 9 (Docket Item 39); Hearing Tr. 7 (Docket Item 44).

27. Inquest Tr. 70–75 (Docket Item 13).

28. Report and Recommendation ¶ 38 (Docket Item 12).

29. *Id.* ¶ 39.

30. Semeraro Aff., Feb. 15, 1999, ¶ 18–19 (Docket Item 22); Semeraro Aff., Aug. 27, 1999, ¶ 7 (Docket Item 35).

31. *See* 15 U.S.C. § 1125(a); *see also Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 120 S.Ct. 1339, 1342–43, 1346, 146 L.Ed.2d 182 (2000); *Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc.,* 989 F.2d 985, 991 (8th Cir.) ("The Lanham Act protects unregistered marks as does the common law.") (internal quotation omitted), *cert. denied,* 510 U.S. 928, 114 S.Ct. 338, 126 L.Ed.2d 282 (1993).

the default although it is important also to recognize that parts of the inquest record were received in evidence at the hearing.[32]

The starting point for this discussion is the relationship between Joseph Selig, plaintiff's principal, and A.E. "Sonny" Dann, his mentor in starting the plaintiff company. Dann, who was a number of years older than Selig, encouraged him to form and initially was a 50 percent partner in plaintiff and, through Dann's company, A.E.D. Imports, Ltd. ("AED"), operated as plaintiff's factor.[33]

In 1994, AED entered into an agreement that provided in relevant part as follows:

> "Confezioni PAOLO SEMERARO hereby appoint A.E.D. IMPORTS LTD. as their sole DISTRIBUTORS/IMPORTERS for the sale of all goods manufactured by them directly or indirectly in their own factories or any factories controlled or associated with them, from this date henceforth. (Minimum quantity 10000 coats × year).
>
> "Confezioni PAOLO SEMERARO hereby undertake that no clothing will be offered by them or anyone acting on their behalf for sale in the U.S.A. except through A.E.D. IMPORTS LTD. their appointed DISTRIBUTORS/IMPORTERS. THIS AGREEMENT IS VALID *ONLY* FOR PRODUCTION OF MEN'S OVERCOATS."[34]

The agreement recited that the parties were AED, plaintiff and CSP. It bore signature lines only for AED and CSP. It was signed by Dann above a line stating "for and on behalf of AED IMPORTS LTD." It was signed by Semeraro[35] above a line stating "for and on behalf of Confezioni PAOLO SEMERARO" and bore a rubber stamp with the name CMV over Semeraro's signature.

As the business developed, plaintiff placed orders with defendants each year for men's overcoats which it then sold in the United States under the Mario Valente name. Indeed, the Court infers that, as Dann aged and became less active in the business, plaintiff for a time became defendants' sole U.S. outlet.[36] But Selig and Semeraro fell out in late 1996 and early 1997 in a dispute over prices, quality and, it seems, the appearance in the United States of overcoats bearing Mario Valente labels that had not been purchased by plaintiff.[37] As they negotiated over the problems with a view toward the 1997 season, Semeraro became concerned that further delay could force him to accede to Selig's position because it would become too late to find another U.S. outlet.[38] So he began looking for a replacement for plaintiff while he continued to negotiate with Selig.

At the time of these events, AAK was defendants' exclusive outlet in Great Britain and sold overcoats made by Semeraro under a private label to Marks & Spencer, a large British department store.[39] Kindler, AAK's chairman, knew that plaintiff

32. Hearing Tr. 55–58, 63–77 (Docket Item 44).

33. Hearing Tr. 37, 41 (Docket Item 44); Inquest Tr. 21 (Docket Item 13).

34. PX 6.

35. Hearing Tr. 18 (Docket Item 44).

36. *See id.* 89.

37. Paolo Semeraro testified before the Court that he had never used Mario Valente labels in the United States. Hearing Tr. 27–28 (Docket Item 44). When confronted by plaintiff at a meeting in February 1997 about the appearance of garments in New York that were not plaintiff's product but nonetheless bore the Mario Valente label, however, he and his son-in-law appear to have acknowledged that they were using the Mario Valente name in New York, replying only that the labels were Mario Valente *Italy* labels. *See* PX 19 (interpreter's minutes of the business meeting) (emphasis added). On the witness stand Paolo Semeraro denied that the meeting in February 1997 took place. Hearing Tr. 27–28 (Docket Item 44). The Court does not find this denial to be credible.

38. *See* PX 13, 14, 18, 19; Hearing Tr. 116 (Docket Item 44).

39. Hearing Tr., June 20, 2000, 39–43 (Docket Item 50).

had the exclusive right to sell Mario Valente overcoats in the United States.[40] But he admitted that Semeraro told him that he had had a falling out with Selig and that Selig no longer was buying from him.[41] So Kindler set up a meeting with the Bloomingdale's buyer who previously had bought Mario Valente coats from plaintiff. He also solicited the aid of his friend, Joseph Sheer, in selling defendants' overcoats in the United States,[42] and Sheer contacted Lord & Taylor, another of plaintiff's major customers.

The evidence established that Sheer telephoned Evan Dash, then the Lord & Taylor buyer with whom plaintiff previously had dealt, in the spring of 1997. He introduced himself as a representative of AAK, said that Kindler was selling Mario Valente overcoats, and solicited an appointment. The Lord & Taylor buyer asked why Sheer was selling Mario Valente coats, as Lord & Taylor previously had bought them from a domestic company (i.e., plaintiff). Sheer explained that plaintiff had gone out of business or lost the label and that Sheer henceforth would be the exclusive source for Mario Valente coats in the United States.[43]

This call had a devastating impact on plaintiff's business with Lord & Taylor. Although Lord & Taylor previously had bought only private label merchandise from plaintiff, it was on the verge of buying Mario Valente branded goods for the following season. Given the uncertainty as to who owned the name, Lord & Taylor dropped plaintiff as a supplier both for private label and Mario Valente brand coats.[44]

The evidence concerning Bloomingdale's was less direct but ultimately no less compelling. Although plaintiff's effort to procure the attendance of the Bloomingdale's buyer at the hearing failed and the Court excluded the buyer's deposition, the fact remains that Bloomingdale's largely dropped plaintiff as a supplier in precisely the same time frame.[45] The Court finds that it did so because Kindler told the Bloomingdale's buyer substantially the same things that Sheer told Lord & Taylor. It bases this finding in part upon the fact that it is likely that Sheer, who was merely aiding Kindler in obtaining orders in the U.S., was told what to say to potential customers by Kindler. The fact that

40. *Id.* 48–49.

By course of dealing, the parties had substituted plaintiff for AED as the exclusive U.S. distributor of defendants' overcoats. *See* Hearing Tr. 87–89 (Docket Item 44). The parties' practical construction of the agreement, as demonstrated by their consistent course of performance, is relevant to a determination of the meaning of the agreement. *Cf.* N.Y.U.C.C. § 2-208(1) (McKinney 1993). Here, plaintiff not only was a party to the agreement that appointed AED the exclusive distributor/importer for defendants' overcoats, but also was the only buyer of the overcoats in the United States from the inception of the agreement. Throughout the parties' course of dealings, up until the dispute giving rise to this action, defendants did not sell their coats to anyone in the United States other than plaintiff. *See* Hearing Tr. 88. Even after AED was liquidated, the defendants continued to deal exclusively with plaintiff. *Id.* at 89. In consequence, the Court finds that the parties intended for plaintiff to serve as the exclusive importer of defendants' coats in the United States. Indeed, Kindler's testimony that he knew that plaintiff had the exclusive U.S. distribution rights to defendants' production must have been based upon his discussions with Semeraro, thus confirming Semeraro's agreement to that relationship.

41. Hearing Tr., June 20, 2000, 44 (Docket Item 50).

42. *Id.* 43–44.

43. *Id.* 12–14.

It should be noted that the coats that plaintiff had sold to Lord & Taylor in the past, although manufactured by defendants, had borne a Lord & Taylor private label rather than the Mario Valente name. Lord & Taylor, however, knew the goods as Mario Valente coats. Moreover, it was on the verge of contracting with plaintiff to purchase coats with Mario Valente labels for the following season. *Id.* 15–16.

44. *Id.* 16–17.

45. Inquest Tr. 71–72 (Docket Item 13).

defendants called Kindler as a witness, after having induced him to travel to the United States for the hearing, yet chose not to elicit his account of his conversations with Bloomingdale's, lends very substantial support to the inference that Kindler told Bloomingdale's exactly what Sheer told Lord & Taylor.

The fact that Kindler and his agent, Sheer, behaved as they did is of no avail to plaintiff here absent proof that Semeraro is legally responsible for their actions, as CPLR § 302(a) requires tortious behavior by the defendant or an agency relationship between the defendant and the tortfeasor. And Kindler and Semeraro both contended at the hearing that Kindler acted independently of Semeraro. But the evidence suggests otherwise.

To begin with, defendants' claim that Semeraro did not even know that Kindler would approach U.S. buyers simply is not credible. There is no reason to suppose that Kindler would have told prospective U.S. customers, directly and through Sheer, that AAK had exclusive U.S. rights for Mario Valente overcoats unless Semeraro had so agreed—and no reason for Semeraro so to have agreed unless he had been assured that Kindler would make a determined effort to succeed in the United States. After all, Semeraro's motive here, given the substantial risk that he would fail to reach agreement with Selig for the coming year, was to use Kindler to find retail outlets for the volume of production he previously had supplied to plaintiff.[46] So Semeraro and Kindler had a community of interest in violating plaintiff's exclusive rights to Semeraro's production and in persuading plaintiff's customers that Kindler, and not plaintiff, was the only available source of those goods. Indeed, they had a community of interest in persuading prospective customers that plaintiff no longer was a factor in the business.[47] In consequence, it is more likely than not that Semeraro and Kindler together hatched a scheme to dump plaintiff as the U.S. distributor of Semeraro's products, to replace it with Kindler's firm, and to persuade plaintiff's existing U.S. customers and others that plaintiff no longer was a factor in the business and that AAK was the exclusive source in the United States of Mario Valente brand goods as well as Semeraro's other products. In such circumstances, Semeraro is legally responsible for all actions by Kindler and his agents in furtherance of the plan.[48]

There is little doubt that the actions of Semeraro and Kindler were tortious. And although Semeraro may not have set foot in New York prior to his motion to set aside the default judgment, his collaboration with Kindler subjects him to personal jurisdiction in New York on two grounds. First, although his agreement with Kindler to participate in behavior that constituted unfair competition and trademark infringement was entered into outside of New York, that behavior caused injury to plaintiff in New York. This injury, in combination with the fact that Semeraro was a party to an exclusive distributorship agreement through which he regularly sold overcoats to plaintiff in New York, thereby deriving revenue from goods used or consumed in New York, serves to satisfy the requirements of jurisdiction under CPLR § 302(a)(3).[49] Second, by virtue of the

46. Indeed, at a January 14, 1997 meeting between the plaintiff, Paolo Semeraro, and Salvatore DiTano, Semeraro's son-in-law, Salvatore stated that if an agreement could not be reached they had "somebody else" to replace plaintiff as a customer. *See* PX 18.

47. Plaintiff perhaps could have located another supplier.

48. *See, e.g., American Baptist Churches of Metropolitan New York v. Galloway,* 710 N.Y.S.2d 12, 17 (1st Dept.2000) ("allegations of conspiracy are permitted 'to connect the actions of separate defendants with an otherwise actionable tort.' ") (quoting *Alexander & Alexander of New York, Inc. v. Fritzen,* 68 N.Y.2d 968, 969, 510 N.Y.S.2d 546, 547, 503 N.E.2d 102 (1986)).

49. Given his business dealings with Kindler in the United Kingdom and plaintiff in the United States, Semeraro derived substantial revenue from international commerce. Because he reasonably should have expected his collusion with Kindler to have consequences in

agency relationship between Semeraro and Kindler, Kindler's actions within New York subject Semeraro to jurisdiction under CPLR § 302(a)(2). Accordingly, the Court holds that Semeraro is subject to *in personam* jurisdiction here under CPLR § 302(a), subds. 2 and 3, with respect to the tort claims. Insofar as he and CSP move to set aside the default judgment for lack of jurisdiction, their motion is denied.

*2. Contract Claim*

The same result follows readily as to the contract claim. The original contract was among CSP—i.e., Semeraro personally,—AED, and plaintiff. Plaintiff ordered goods from defendants throughout the relevant period. It succeeded to AED's position as the exclusive U.S. importer of defendants' output. Even if it did not, the contract forbad defendants from selling to anyone other than AED for import into the United States. Thus, plaintiff's contract claim manifestly arises out of defendants' contract to supply goods in New York.

CSP and Semeraro nevertheless argue that the only contracting party was CMV and that CMV alone is subject to jurisdiction here. The argument is without merit. CMV signed the original agreement for and on behalf of CSP—Semeraro. That Semeraro, who controlled CMV, later billed plaintiff on CMV invoices simply does not change the fact that it was Semeraro himself who was responsible for filling the orders. There is no reason to suppose that plaintiff, particularly in light of the 1994 agreement, ever looked to CMV to the exclusion of Semeraro and CSP.

Accordingly, the Court holds that it has *in personam* jurisdiction over Semeraro pursuant to CPLR § 302(a), subd. 1, with respect to the contract claim.

Because the Court finds that there is personal jurisdiction over Semeraro and CSP, there is no basis for a finding that the default judgment entered against them is void. In consequence, defendants' Rule 60(b)(4) motion is denied.

## III

All defendants seek *vacatur* of the default judgment for excusable neglect pursuant to Rule 60(b)(1).[50] In this respect, the Court adopts Magistrate Judge Eaton's recommendation. The application was not brought within a reasonable time as required by the rule. In any case, for reasons already articulated, the Court finds that the default was willful. In addition, plaintiff quite obviously would be prejudiced in that (1) Sonny Dann, who was intimately involved with all parties and had extensive knowledge of the facts, died following the inquest and plaintiff therefore was deprived of critical testimony by reason of defendants' default, and (2) plaintiff has expended considerable time and money seeking to enforce the judgment in Italy, expenditures that would not have been incurred had defendants not deliberately defaulted in this action. Accordingly, even if defendants had a meritorious defense, which is debatable notwithstanding the low threshold insofar as merit is relevant to whether to vacate a default judgment,[51] the Court would decline to vacate the judgment. Defendants' Rule 60(b)(1) motion is denied.

New York, jurisdiction also is proper under Section 302(a)(3)(ii).

50. Fed.R.Civ.P. 60(b)(1).

51. *See, e.g., Securities and Exchange Comm'n v. McNulty,* 137 F.3d 732, 738, 740 (2d Cir.) ("In deciding a motion to vacate a default judgment, the district court is to be guided principally by three factors: (1) whether the default was willful, (2) whether the defendant demonstrates the existence of a meritorious defense, and (3) whether, and to what extent, vacating the default will cause the nondefaulting party prejudice.... In order to make a sufficient showing of a meritorious defense ... the defendant need not establish his defense conclusively, but he must present evidence of facts that, if proven at trial, would constitute a complete defense.") (internal quotation and citations omitted), *cert. denied,* 525 U.S. 931, 119 S.Ct. 340, 142 L.Ed.2d 281 (1998); *Gonzalez v. City of New York,* 104 F.Supp.2d 193, 195–96 (S.D.N.Y.2000).

IV

Finally, defendants have moved to vacate the judgment under Rule 60(b)(6). In light of the foregoing, namely defendants' wilful default, their lack of meritorious defense, and the prejudice to plaintiff that would result from a *vacatur*, the Court does not find any reason justifying a grant of relief from the previously entered judgement. In consequence, defendants' Rule 60(b)(6) motion is denied.

V

Plaintiff's counsel recently submitted an additional memorandum in which he contended that the damages awarded by the Magistrate Judge at the inquest should be increased in light of certain evidence adduced during the recent jurisdictional hearing. The application is denied. Plaintiff had a full opportunity to present evidence of damages at the inquest. Defendants had no notice during the recent hearing that such additional relief would be sought. Moreover, plaintiff's latest submission is based on the contention that the evidence at the hearing established breaches by defendants of plaintiff's right of exclusivity in the United States. But the amended complaint asserts no such claim. Accordingly, the application is denied.

Plaintiff's application for an order requiring defendants to give security pending the determination of the motion to vacate the judgment is denied as moot.

*Conclusion*

The defendants' motion to vacate their default and the default judgment entered against them is denied in all respects. Plaintiff's cross-motion to amend the judgment is disposed of in accordance with the recommendation of Magistrate Judge Eaton.

SO ORDERED.