**MARIO VALENTE COLLEZIONI, LTD., Plaintiff,**

v.

**AAK LIMITED and Maurice Ian Kindler, Defendants.**

No. 02 Civ. 0099(RPP).

United States District Court, S.D. New York.

Sept. 8, 2003.

Thomas M. Mullaney, Esq., New York, NY, for Plaintiff.

Cohen, Pontani, Lieberman & Pavane, by Martin B. Pavane, Esq., William A.

Alper, Esq., New York, NY, for Defendants.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Defendants AAK Limited and Maurice Ian Kindler (collectively, "Defendants") move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff Mario Valente Collezioni, Limited ("Plaintiff") cross-moves for summary judgment on the issue of collateral estoppel pursuant to Fed.R.Civ.P. 56. For the following reasons, Defendants' motion is denied in part and granted in part and Plaintiff's cross-motion is denied in part and granted in part.

### *Background* [1]

In 1997, Plaintiff brought an action against Confezioni Semeraro Paolo, S.R.L., et. al. (the "Semeraro defendants"), located in Italy, for breach of contract, trademark infringement and unfair competition (the "Semeraro Action"). The Semeraro defendants did not respond and a default judgment was entered against them. *See Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.*, 115 F.Supp.2d 367, 369 (S.D.N.Y.2000). Following an inquest, at which the Semeraro defendants did not appear, Magistrate Judge Eaton issued a report and recommendation on March 23, 1998 recommending that Plaintiff be awarded damages totaling $1,645,970 plus interest. *See id.* The

Semeraro defendants received the report and recommendation but entered no objections. *See id.* On April 10, 1998, the Court entered judgment for Plaintiff in the amount of $1,693,387.62. *See id.* Plaintiff then commenced a proceeding in the Court of Appeals of Bari, Italy, in October 1998, for recognition of the American judgment. *See id.* The Semeraro defendants defaulted in the Italian action, and on January 26, 1999, the Italian court recognized and registered the American judgment. *See id.*

On March 24, 1999, the Semeraro defendants filed a motion before Judge Kaplan, pursuant to Rules 55(c) and 60(b) of the Federal Rules of Civil Procedure to vacate the default judgment entered against them, claiming lack of jurisdiction. *Id.* at 368–69. After an evidentiary hearing conducted on February 8, February 9 and June 20, 2000, during which Defendant Kindler, Mr. Semeraro, his son-in-law and other witnesses testified, (*id.* at 376) Judge Kaplan denied the motion. *Id.* at 378. The decision was appealed by the Semeraro defendants, and the Second Circuit held that the district court properly found personal jurisdiction over the Semeraro defendants, but erred in failing to perform a federal due process analysis. *Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.*, 264 F.3d 32 (2d Cir. 2001). The Second Circuit affirmed and remanded the case back to Judge Kaplan on the due process issue. *Id.* at 38. On remand, Judge Kaplan found that the exercise of personal jurisdiction over the

---

1. The Court refers to the following documents in this Opinion:

 a) The Deposition of Maurice Kindler dated Friday, January 24, 2003 (the "Kindler Deposition"), portions of which are attached as Exhibit 6 to the Declaration of Jeremy Kaufman dated March 13, 2003 (the "Kaufman Declaration"); as Exhibit D to the Affidavit of Thomas M. Mullaney, dated April 2, 2003, (the "Mullaney Affidavit"); and as Exhibit 11

to the Second Declaration of Jeremy Kaufman dated April 23, 2003 (the "Second Kaufman Declaration").

 b) The Deposition of Joseph Selig, President of Plaintiff, dated January 29, 2003 (the "Selig Deposition"), portions of which are attached as Exhibit 2 to the Kaufman Declaration.

 c) Records of Brooks Brothers, attached as Exhibit I to the Mullaney Affidavit.

Semeraro defendants did not violate due process of law and the judgment became final. *Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.,* 174 F.Supp.2d 170, 176 (S.D.N.Y.2001). No part of the judgement has been paid. (Selig Dep. at 244.)

In finding jurisdiction over the Semeraro defendants pursuant to C.P.L.R. § 302(a), Judge Kaplan addressed the issues before him:

> The second and fourth claims quite plainly allege torts. Plaintiff is based in and therefore felt any injury in New York. Hence, if Semeraro and CSP, or their agents, committed any tortious act in New York, they are subject to jurisdiction in accordance with CPLR § 302(a), subd. 2. Similarly, if they committed any tortious act outside the state and satisfied its other requirements, they are subject to jurisdiction under CPLR § 302(a), subd. 3.

> The plaintiff submitted evidence at the inquest to the effect that Semeraro, who is the sole owner of CMV and the sole proprietor of CSP, sent representatives of AAK Ltd. ("AAK"), a United Kingdom company the chairman of which is Maurice Kindler, to New York to tell plaintiff's customers that Kindler had taken over the Mario Valente label in the United States and that plaintiff was out of business, thus costing plaintiff at least two major accounts. In short, they allegedly cut plaintiff out of the business, leading Magistrate Judge Eaton to find that "the defendants participated in infringement of plaintiff's trade-name and in unfair competition with the intention of damaging plaintiff." He recommended a large damage award based entirely on the loss by plaintiff of its Lord & Taylor and Bloomingdale's accounts as a consequence of what he

found to be tortious behavior attributable to defendants.

> Defendants respond to these allegations and findings by claiming that (1) "Mario Valente" is not a registered trademark and therefore is not protected, (2) defendants never sold goods in the United States under the "Mario Valente" name, and (3) defendants could not prevent third parties to whom CMV sold "Mario Valente" coats in Europe from reselling in the United States.

> Defendants' first point is entirely without merit. Both the common law and the Lanham Act protect trademarks and trade names irrespective of whether they are registered. The more difficult question is whether Semeraro is subject to long arm jurisdiction in New York on these claims. And it is essential to define the record on which that question must be decided, as it differs in important respects from that which was before the Magistrate Judge.

> Upon reviewing the papers in support of and in opposition to the motion to vacate the default judgment, this Court concluded that an evidentiary hearing on the jurisdictional issue raised by Semeraro and CSP was appropriate and subsequently conducted a hearing over parts of three days. Accordingly, the record that controls determination of the jurisdictional issue is that of the evidentiary hearing on the motion rather than the inquest that followed the default although it is important also to recognize that parts of the inquest record were received in evidence at the hearing.

*Mario Valente,* 115 F.Supp.2d at 373–74. Judge Kaplan then made the following findings of fact:[2]

> The starting point for this discussion is the relationship between Joseph Selig,

---

**2.** All except four footnotes have been omitted in an effort to conserve time, space and trees.

plaintiff's principal, and A.E. "Sonny" Dann, his mentor in starting the plaintiff company. Dann, who was a number of years older than Selig, encouraged him to form and initially was a 50 percent partner in plaintiff and, through Dann's company, A.E.D. Imports, Ltd. ("AED"), operated as plaintiff's factor. In 1994, AED entered into an agreement that provided in relevant part as follows: "Confezioni PAOLO SEMERARO hereby appoint A.E.D. IMPORTS LTD. as their sole DISTRIBUTORS/IMPORTERS for the sale of all goods manufactured by them directly or indirectly in their own factories or any factories controlled or associated with them, from this date henceforth." (Minimum quantity 10000 coats × year).

"Confezioni PAOLO SEMERARO hereby undertake that no clothing will be offered by them or anyone acting on their behalf for sale in the U.S.A. except through A.E.D. IMPORTS LTD. their appointed DISTRIBUTORS/IMPORTERS. THIS AGREEMENT IS VALID ONLY FOR PRODUCTION OF MEN'S OVERCOATS."

The agreement recited that the parties were AED, plaintiff and CSP. It bore signature lines only for AED and CSP. It was signed by Dann above a line stating "for and on behalf of AED IMPORTS LTD." It was signed by Semeraro above a line stating "for and on behalf of Confezioni PAOLO SEMERARO" and bore a rubber stamp with the name CMV over Semeraro's signature.

As the business developed, plaintiff placed orders with defendants each year for men's overcoats which it then sold in the United States under the Mario Valente name. Indeed, the Court infers that, as Dann aged and became less active in the business, plaintiff for a time became defendants' sole U.S. outlet.

But Selig and Semeraro fell out in late 1996 and early 1997 in a dispute over prices, quality and, it seems, the appearance in the United States of overcoats bearing Mario Valente labels that had not been purchased by plaintiff. [FN 37] As they negotiated over the problems with a view toward the 1997 season, Semeraro became concerned that further delay could force him to accede to Selig's position because it would become too late to find another U.S. outlet. So he began looking for a replacement for plaintiff while he continued to negotiate with Selig.

[FN 37] Paolo Semeraro testified before the Court that he had never used Mario Valente labels in the United States. Hearing Tr. 27–28 (Docket Item 44). When confronted by plaintiff at a meeting in February 1997 about the appearance of garments in New York that were not plaintiff's product but nonetheless bore the Mario Valente label, however, he and his son-in-law appear to have acknowledged that they were using the Mario Valente name in New York, replying only that the labels were Mario Valente Italy labels. See PX 19 (interpreter's minutes of the business meeting) (emphasis added). On the witness stand Paolo Semeraro denied that the meeting in February 1997 took place. Hearing Tr. 27–28 (Docket Item 44). The Court does not find this denial to be credible.

At the time of these events, AAK was defendants' exclusive outlet in Great Britain and sold overcoats made by Semeraro under a private label to Marks & Spencer, a large British department store. Kindler, AAK's chairman, knew that plaintiff had the exclusive right to sell Mario Valente overcoats in the United States. [FN40] But he admitted that Semeraro told him that he had had a falling out with Selig and that Selig no

longer was buying from him. So Kindler set up a meeting with the Bloomingdale's buyer who previously had bought Mario Valente coats from plaintiff. He also solicited the aid of his friend, Joseph Sheer, in selling defendants' overcoats in the United States, and Sheer contacted Lord & Taylor, another of plaintiff's major customers.

FN40. [Hearing Tr., June 20, 2000,] 48–49 [Docket Item 50].

By course of dealing, the parties had substituted plaintiff for AED as the exclusive U.S. distributor of defendants' overcoats. *See* Hearing Tr. 87–89 (Docket Item 44). The parties' practical construction of the agreement, as demonstrated by their consistent course of performance, is relevant to a determination of the meaning of the agreement. *Cf. N.Y.U.C.C. § 2–208(1) (McKinney 1993)*. Here, plaintiff not only was a party to the agreement that appointed AED the exclusive distributor/importer for defendants' overcoats, but also was the only buyer of the overcoats in the United States from the inception of the agreement. Throughout the parties' course of dealings, up until the dispute giving rise to this action, defendants did not sell their coats to anyone in the United States other than plaintiff. *See* Hearing Tr. 88. Even after AED was liquidated, the defendants continued to deal exclusively with plaintiff. *Id.* at 89. In consequence, the Court finds that the parties intended for plaintiff to serve as the exclusive importer of defendants' coats in the United States. Indeed, Kindler's testimony that he knew that plaintiff had the exclusive U.S. distribution rights to defendants' production must have been based upon his discussions with Semeraro, thus confirming Semeraro's agreement to that relationship.

The evidence established that Sheer telephoned Evan Dash, then the Lord & Taylor buyer with whom plaintiff previously had dealt, in the spring of 1997. He introduced himself as a representative of AAK, said that Kindler was selling Mario Valente overcoats, and solicited an appointment. The Lord & Taylor buyer asked why Sheer was selling Mario Valente coats, as Lord & Taylor previously had bought them from a domestic company (i.e., plaintiff). Sheer explained that plaintiff had gone out of business or lost the label and that Sheer henceforth would be the exclusive source for Mario Valente coats in the United States. [FN43]

FN43. [Hearing Tr., June 20, 2000,] 12–14 [Docket Item 50].

It should be noted that the coats that plaintiff had sold to Lord & Taylor in the past, although manufactured by defendants, had borne a Lord & Taylor private label rather than the Mario Valente name. Lord & Taylor, however, knew the goods as Mario Valente coats. Moreover, it was on the verge of contracting with plaintiff to purchase coats with Mario Valente labels for the following season. *Id.* 15–16.

This call had a devastating impact on plaintiff's business with Lord & Taylor. Although Lord & Taylor previously had bought only private label merchandise from plaintiff, it was on the verge of buying Mario Valente branded goods for the following season. Given the uncertainty as to who owned the name, Lord & Taylor dropped plaintiff as a supplier both for private label and Mario Valente brand coats. [FN 44]

[FN 44] *Id.* 16–17.

The evidence concerning Bloomingdale's was less direct but ultimately no less compelling. Although plaintiff's effort to procure the attendance of the Bloom-

ingdale's buyer at the hearing failed and the Court excluded the buyer's deposition, the fact remains that Bloomingdale's largely dropped plaintiff as a supplier in precisely the same time frame. The Court finds that it did so because Kindler told the Bloomingdale's buyer substantially the same things that Sheer told Lord & Taylor. It bases this finding in part upon the fact that it is likely that Sheer, who was merely aiding Kindler in obtaining orders in the U.S., was told what to say to potential customers by Kindler. The fact that defendants called Kindler as a witness, after having induced him to travel to the United States for the hearing, yet chose not to elicit his account of his conversations with Bloomingdale's, lends very substantial support to the inference that Kindler told Bloomingdale's exactly what Sheer told Lord & Taylor.

The fact that Kindler and his agent, Sheer, behaved as they did is of no avail to plaintiff here absent proof that Semeraro is legally responsible for their actions, as CPLR § 302(a) requires tortious behavior by the defendant or an agency relationship between the defendant and the tortfeasor. And Kindler and Semeraro both contended at the hearing that Kindler acted independently of Semeraro. But the evidence suggests otherwise.

To begin with, defendants' claim that Semeraro did not even know that Kindler would approach U.S. buyers simply is not credible. There is no reason to suppose that Kindler would have told prospective U.S. customers, directly and through Sheer, that AAK had exclusive U.S. rights for Mario Valente overcoats unless Semeraro had so agreed—and no reason for Semeraro so to have agreed unless he had been assured that Kindler would make a determined effort to succeed in the United States. After all,

Semeraro's motive here, given the substantial risk that he would fail to reach agreement with Selig for the coming year, was to use Kindler to find retail outlets for the volume of production he previously had supplied to plaintiff. So Semeraro and Kindler had a community of interest in violating plaintiff's exclusive rights to Semeraro's production and in persuading plaintiff's customers that Kindler, and not plaintiff, was the only available source of those goods. Indeed, they had a community of interest in persuading prospective customers that plaintiff no longer was a factor in the business. In consequence, it is more likely than not that Semeraro and Kindler together hatched a scheme to dump plaintiff as the U.S. distributor of Semeraro's products, to replace it with Kindler's firm, and to persuade plaintiff's existing U.S. customers and others that plaintiff no longer was a factor in the business and that AAK was the exclusive source in the United States of Mario Valente brand goods as well as Semeraro's other products. In such circumstances, Semeraro is legally responsible for all actions by Kindler and his agents in furtherance of the plan.

There is little doubt that the actions of Semeraro and Kindler were tortious. And although Semeraro may not have set foot in New York prior to his motion to set aside the default judgment, his collaboration with Kindler subjects him to personal jurisdiction in New York on two grounds. First, although his agreement with Kindler to participate in behavior that constituted unfair competition and trademark infringement was entered into outside of New York, that behavior caused injury to plaintiff in New York. This injury, in combination with the fact that Semeraro was a party to an exclusive distributorship agree-

ment through which he regularly sold overcoats to plaintiff in New York, thereby deriving revenue from goods used or consumed in New York, serves to satisfy the requirements of jurisdiction under CPLR § 302(a)(3). Second, by virtue of the agency relationship between Semeraro and Kindler, Kindler's actions within New York subject Semeraro to jurisdiction under CPLR § 302(a)(2). Accordingly, the Court holds that Semeraro is subject to *in personam* jurisdiction here under CPLR § 302(a), subds. 2 and 3, with respect to the tort claims. Insofar as he and CSP move to set aside the default judgment for lack of jurisdiction, their motion is denied.

*Id.* at 374–77.[3]

### The Present Action

In January 2002, Plaintiff commenced the present action against Defendants.[4] According to the Complaint filed on January 7, 2002, in 1994 the Semeraro defendants gave Plaintiff the exclusive right to import and sell Semeraro men's overcoats in the United States and the "exclusive right to the use of the trade-name and trademark in the United States of 'Mario Valente,' in connection with the distribution and sale of its men's overcoat [sic] and related products" and Defendants had knowledge of Plaintiff's exclusive rights. (Complaint ¶¶ 6, 7, 10.) Commencing in or about 1997, Defendants received men's overcoats from the Semeraro factories, and exported them to Brooks Brothers in the United States, pursuant to a pre-arrangement with the Semeraro defendants.[5] (*Id.* ¶ 9.) In the spring of 1997 and subsequently, Defendants and their agent solicited and sought to sell Semeraro overcoats and related products to Lord & Taylor and Bloomingdale's, falsely representing that Plaintiff was going out of business and that Defendants had gained the rights to sell the "Mario Valente" line and use the "Mario Valente" tradename and trademark. (*Id.* ¶ 11.)

Plaintiff alleged the following claims in its Complaint: 1) injury in business due to unfair competition; 2) injury by infringement of tradename and trademark; and 3) injury by intentional and willful interference by Defendants in Plaintiff's contractual and business relationships. (*Id.* ¶¶ 16–21.) Plaintiff alleged that its action was brought generally pursuant to 28 U.S.C. §§ 1332(a)(2), 1367(b), 1391(a) and (d), New York Civil Practice Law Rules (CPLR), §§ 302(a)1, 3(i) and (ii) and other such applicable laws "including the Common Law of the United States and the State of New York." (*Id.* ¶ 1.)

Defendants moved for summary judgment on all three claims in the Complaint on March 13, 2003 and on April 2, 2003, Plaintiff filed its cross-motion for summary

**3.** Judge Kaplan also found personal jurisdiction over Plaintiff's breach of contract claim and that the claim "manifestly arises out of [the Semeraro] defendants' contract to supply goods in New York pursuant to C.P.L.R. § 302(a), subd. 1." *Mario Valente,* 115 F.Supp.2d at 377.

**4.** The Complaint premises federal jurisdiction on diversity (Compl.¶ 1), as well as other such applicable laws "including the Common Law of the United States." (*Id.*) Plaintiff clarified in its cross-motion and at oral argument that claims in the Complaint were brought pursu-

ant to the Lanham Act. (Plaintiff's Memorandum of Law in Opposition at 15–21; tr. at 44–46.)

**5.** Plaintiff has established that Defendant AAK Limited placed such orders in 1996 and had shipped Semeraro defendants' men's overcoats with Brooks Brothers labels to Brooks Brothers in 1996 and 1997 from Italy. (Kindler Dep. at 26 ("some hundreds")); Records of Brooks Brothers Records (some thousands).

judgment on liability and on all three claims, based on a theory of collateral estoppel.[6] Oral argument on these motions was held on June 10, 2003.[7]

## Discussion

### I. Standard for Summary Judgment

The standard for granting summary judgment is:

First, summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Second, the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists. In considering that, third, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. Fourth, the moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case. When no rational [fact finder] could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper.

*Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1223–24 (2d Cir.1994) (internal citations omitted). *Cf. Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Electric Industrial Co. Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Adickes v.* *S.H. Kress & Company,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

### II. Collateral Estoppel

■ Under federal law, collateral estoppel, or issue preclusion applies when: "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 288–89 (2d Cir.2002) (internal citation and quotations omitted). Issue preclusion attaches only in the case that "an issue of fact or law is actually litigated and determined by a valid final judgment" and not in the case when "a judgment [is] entered by ... default." *Arizona v. California,* 530 U.S. 392, 414, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000) (internal citation and quotations omitted).

■ The claims brought by Plaintiff against the Semeraro defendants were based on diversity jurisdiction. The Supreme Court has held that the preclusive effect of any decision by a federal court, sitting in a diversity action, is to be determined by the applicable preclusion law of the state in which the district court sat. *Semtek Int'l Inc. v. Lockheed Martin Corp.,* 531 U.S. 497, 508–09, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001). The rule in Semtek "applies to the situation ... where the preclusive effect of a federal decision in a diversity case is being litigated in federal court." *NAS Electronics, Inc. v. Transtech Electronics PTE Ltd.,* 262 F.Supp.2d 134, 142 (S.D.N.Y.2003).

---

**6.** Plaintiff filed a Counterstatement in opposition to Defendants' Rule 56.1 Statement, but did not file a separate Rule 56.1 Statement in support of its cross motion. (Transcript at 37.)

**7.** All transcript citations refer to oral argument on the pending motions held on June 10, 2003.

As Judge Koeltl recently stated in *NAS Electronics*:

> Under New York law, "[c]ollateral estoppel or issue preclusion 'precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party [or those in privity,] whether or not the tribunals or causes of action are the same.'" *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir.2000) (quoting *Ryan v. New York Tel. Co.*, 62 N.Y.2d 494, 478 N.Y.S.2d 823, 467 N.E.2d 487, 490 (N.Y.1984)); *see also, Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir.1995). Whether an issue decided in a prior proceeding has preclusive effect "depends on the specific facts and circumstances of each case." Collateral estoppel applies only " 'if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action.'" *Id.* (quoting *Parker v. Blauvelt Volunteer Fire Co.*, 93 N.Y.2d 343, 690 N.Y.S.2d 478, 712 N.E.2d 647, 651 (N.Y.1999)) ... In addition, the issue must be decisive and conclusive in the subsequent action. *See Wight v. Bankamerica Corp.*, 219 F.3d 79, 86 (2d Cir.2000) ...

*Id.* at 143 (some string citations omitted).

The Second Circuit has recognized privity in the context of collateral estoppel "based on representation only if the interests of the person alleged to be in privity were represented in the prior proceeding by another vested with the authority of representation." *Stichting Ter Behartig-ing Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber*, 327 F.3d 173, 185 (2d Cir.2003) (internal citations and quotations omitted). *See also, Monahan v. New York Department of Corrections*, 214 F.3d 275, 285 (2d Cir.), *cert. denied*, 531 U.S. 1035, 121 S.Ct. 623, 148 L.Ed.2d 533 (2000). The Second Circuit has found privity in a situation "where a party to a previous suit was, at the time of litigation, acting as either a fiduciary or organizational agent of the person against whom preclusion is asserted." *Schreiber*, 327 F.3d at 185. Privity has also been found to exist in the absence of a fiduciary or agency relationship when the "person nonetheless exercised some degree of actual control over the presentation of a party's case at the previous proceeding." *Id.* *See also, Central Hudson Gas & Electric Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir.1995).

In this case, the Semeraro defendants filed a motion to vacate the judgment against them on March 24, 1999. *Mario Valente*, 115 F.Supp.2d at 369. An evidentiary hearing to determine the jurisdictional issue raised by the Semeraro defendants was held before Judge Kaplan over parts of three days, and Defendant Kindler was called and testified for the Semeraro defendants.[8] *See id.* at 373, 375–76. Judge Kaplan made findings and denied the motion to vacate the judgement by Opinion dated September 8, 2000. *Id.* at 374–78.

Defendants' current motion claims that 1) the tortious interference and unfair competition claims are time-barred by the applicable statute of limitations; 2) the evidence in the record does not support

---

8. Prior to testifying at the evidentiary hearing before Judge Kaplan, Defendant Kindler received a written indemnification agreement from the Semeraro Defendants. (Kindler Dep. at 11–12.) In anticipation of the current action, Defendant Kindler entered into a second written indemnification agreement in January 2002 under which the Semeraro defendants are paying Defendant Kindler's legal fees. (*Id.* at 13.)

the unfair competition and trademark claims; and 3) Defendants are not bound by the judgment in the Semeraro Action. (Defendants' Notice of Motion; Defendants' Memorandum of Law in Support of Summary Judgment.)

■ The parties have cited no cases, and this Court could not find any precedent that addresses the precise situation presented in the case, namely, whether a court's findings of fact and conclusions of law at an evidentiary hearing, in connection with a motion to vacate a default judgment, are binding on the agent of the defendant in a later proceeding brought against the agent. Nevertheless, since Judge Kaplan, after conducting a three day evidentiary hearing in which both parties appeared and Defendant Kindler testified, found that an "agency relationship" existed between Semeraro and Kindler, and that "Semeraro [was] legally responsible for all actions by Kindler and his agents" (*id.* at 376–77), the Court concludes that Judge Kaplan's factual findings that tortious acts harming Plaintiff were committed by AAK and Kindler and the Semeraro defendants are the equivalent of a decision on the merits. Accordingly, the Court will review the validity of each of Plaintiff's claims, and if necessary, determine if the evidence satisfies the *Marvel* factors.

### A. Plaintiff's Tortious Interference Claim

■ Pursuant to New York law, a claim alleging interference with contractual and business relationships is subject to a three year statute of limitations. *See* N.Y. C.P.L.R. § 214(4); *Besicorp Ltd. v. Kahn,* 290 A.D.2d 147, 150, 736 N.Y.S.2d 708 (N.Y.App.Div.2002). The limitations peri-

od for tortious interference claims begins to run on the date that the alleged injury takes place. *See Weizmann Institute of Science v. Neschis,* 229 F.Supp.2d 234, 252 (S.D.N.Y.2002). Plaintiff does not dispute these points. Plaintiff alleged that in the Spring of 1997, Defendants exported Semeraro overcoats to Brooks Brothers in violation of Plaintiff's exclusive right to the importation and sale of Semeraro overcoats. (Compl.¶ 9.) Plaintiff also alleged that "[d]uring the Spring of 1997, and thereafter," [9] Defendants solicited orders for Semeraro overcoats from Lord & Taylor and Bloomingdale's. (*Id.* ¶ 11.) Plaintiff brought the current Complaint against Defendants in January 2002, tolling the statute of limitations. During oral argument on the current motion, Plaintiff conceded that the tortious interference claim was outside the applicable three year statute of limitations. (Tr. at 44.) Defendants' motion for summary judgment with respect to the tortious interference claim is granted.

### B. Plaintiff's Unfair Competition Claim

Both parties addressed Plaintiff's unfair competition claim under the Lanham Act in their briefs and at oral argument.

#### 1. Substantive Law

Section 43 of the Lanham Act provides in relevant part:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading

---

**9.** Plaintiff does not allege any specific facts that took place "thereafter" (the Spring of 1997), and Plaintiff does not argue that al- leged wrongdoing was ongoing in an effort to counter Defendants' statute of limitations defense.

description of fact, or false or misleading representation of fact, which-

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. §§ 1125(a)(1)(A) and (B). "Commerce" under the Lanham Act means "all commerce which may be lawfully regulated by Congress."[10] 15 U.S.C. § 1127.

### a. 15 U.S.C. § 1125(a)(1)(A)

The first prong of Section 43 of the Lanham Act states that "any person who, on or in connection with any goods or services ... uses in commerce" a "false or misleading description of fact" or a "false or misleading representation of fact" that is "likely to ... deceive as to the affiliation of ... such person with another person, or as to the ... sponsorship ... of his or her goods ... or commercial activities by another person" is liable under the act. 15 U.S.C. § 1125(a)(1)(A).

■ In the Semeraro Action, Judge Kaplan found the following:

Kindler set up a meeting with the Bloomingdales's buyer who previously had bought Mario Valente coats from [p]laintiff. He also solicited the aid of his friend, Joseph Sheer in selling defendants' overcoats in the United States, and Sheer contracted Lord & Taylor, another of [p]laintiff's major customers. The evidence established that Sheer telephoned ... the Lord & Taylor buyer ... in the Spring of 1997[,] ... introduced himself as a representative of AAK, said that Kindler was selling Mario Valente overcoats, and solicited an appointment ... Sheer explained that [p]laintiff had *gone out of business* or *lost the label* and that Sheer henceforth would be the exclusive source for Mario Valente coats in the United States.

This call had a devastating impact on [p]laintiff's business with Lord & Taylor ... [and] Lord & Taylor dropped [p]laintiff as a supplier both for private label and Mario Valente brand coats.

*Mario Valente*, 115 F.Supp.2d at 375 (emphasis added). Judge Kaplan similarly held that "[t]he evidence concerning Bloomingdale's was less direct but ultimately no less compelling," and that "Kindler told the Bloomingdale's buyer substantially the same things that Sheer told Lord & Taylor." *Id.* In addition, Judge Kaplan specifically noted Defendant Kindler's own testimony at the jurisdictional hearing that "he knew that [P]laintiff had the exclusive U.S. distribution rights to defendants' production." *Id.* at 375, n. 40. Accordingly, Judge Kaplan's findings establish that Defendants Kindler and AAK, with knowledge of Plaintiff's exclusive dis-

**10.** The Complaint describes Brooks Brothers as "a major department store chain in New York and throughout the United States" (Compl.¶ 9) and Lord & Taylor and Bloomingdale's as "major American department store chains." (*Id.* ¶ 11.) This Court takes judicial notice of the fact that Brooks Broth- ers, Bloomingdale's and Lord & Taylor are major American department store chains and are engaged in interstate commerce, and that sales related to these vendors may be lawfully regulated by Congress. This fact is not contested by either party.

tribution rights in the United States, 1) attempted to sell Semeraro overcoats in the United States; 2) used false and misleading descriptions of fact and representations of fact which were likely to deceive Lord & Taylor and Bloomingdale's as to Plaintiff's right to sell Mario Valente overcoats in the United States; and 3) damaged Plaintiff's business relationship with Lord & Taylor and Bloomingdale's in violation of 15 U.S.C. § 1125(a)(1)(A).

### b. 15 U.S.C. § 1125(a)(1)(B)

For liability under the second prong of Section 43, a person must, "in connection with any goods or services ... use in commerce" a "false or misleading representation of fact ... in ... promotion [that] misrepresents the nature ... and qualities ... of ... another person's goods ... or commercial activities." 15 U.S.C. § 1125(a)(1)(B).

■ With respect to "commercial advertising or promotion" under Section 43 of the Lanham Act, the Second Circuit has adopted a three-part test. *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 56–58 (2d Cir.2002). An alleged representation is actionable under the Lanham Act if it is: "(1) commercial speech; ... [ (2) ] for the purpose of influencing consumers to buy defendant's goods or services; and [ (3) ] ... [is] disseminated sufficiently to the relevant purchasing public." *Id.* With respect to the dissemination requirement of § 1125(a)(1)(B), the Second Circuit noted:

> [T]he touchstone ... is that the contested representations are part of an organized campaign to penetrate the relevant market. Proof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement. Thus, businesses harmed by isolated disparaging statements do not have redress under the

Lanham Act; they must seek redress under state law causes of action. *Id.* at 57.

■ The findings by Judge Kaplan detailed above in relation to 15 U.S.C. § 1125(a)(1)(A) that Defendants AAK and Kindler misrepresented to Lord & Taylor and Bloomingdale's that Plaintiff had lost the Mario Valente label and had gone out of business, and that Defendant Kindler knew that Plaintiff had the exclusive distribution rights to the Semeraro defendants' production, are equally relevant to the analysis here under the second prong of Section 43. The only additional requirement under the law for the second prong of Section 43 is that the misrepresentation occur in "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). To that end, Defendants argue that, aside from Lord & Taylor and Bloomingdale's, they never contacted any of Plaintiff's "other customers or potential customers in the United States, of which there are at least 80, possibly hundreds," (Defs.' Mem. of Law in Support of Summ. J. at 12.) and Judge Kaplan's findings do not constitute a sufficient showing of "widespread dissemination." *Fashion Boutique*, 314 F.3d at 57.

Judge Kaplan stated that Magistrate Judge Eaton's large damage award was "based entirely on the loss by [P]laintiff of its Lord & Taylor and Bloomingdale's accounts as a consequence of what he found to be tortious behavior attributable to [the Semeraro] defendants." *Mario Valente*, 115 F.Supp.2d at 373. Judge Kaplan found that Defendant Kindler's actions had "a devastating impact on [P]laintiff's business with Lord & Taylor," *id.* at 375, and ended up "costing [P]laintiff at least two major accounts." *Id.* at 373. It is not clear, however, from Judge Kaplan's findings that the magnitude of business that Lord & Taylor and Bloomingdale's consti-

tuted for Plaintiff satisfies the "widespread dissemination" requirement of *Fashion Boutique*, 314 F.3d at 57.[11] Accordingly, there is inadequate proof of the violation of 15 U.S.C. § 1125(a)(1)(B).

### c. *Marvel Characters* Analysis

Thus, with respect to Plaintiff's unfair competition claim under the Lanham Act, all of the requirements under *Marvel Characters*, 310 F.3d at 288–89, are satisfied. Pursuant to *Marvel Characters:* 1) the identical issues were raised in the Semeraro Action, *i.e.,* whether Plaintiff had a contract with the Semeraro defendants for the exclusive distribution of their men's overcoats in the United States, *Mario Valente*, 115 F.Supp.2d at 375, n. 40; whether Defendant Kindler, with knowledge of Plaintiff's exclusive distribution rights, acted as agent for Semeraro, falsely claiming that Plaintiff had lost the label and was out of business and that Defendant AAK was the exclusive source in the United States for Mario Valente overcoats, *id.* at 375; and whether the false claim was likely to deceive, *id.* at 375, n. 43; 2) the issues were actually litigated and decided before Judge Kaplan to the extent that Judge Kaplan made findings of fact at the jurisdictional hearing that Defendants Kindler and AAK had committed "tortious" actions, *id.* at 376; 3) AAK and Kindler, who was indemnified by the Semeraro defendants before appearing as a witness before Judge Kaplan (Kindler Dep. at 11–12), had a full and fair opportunity to litigate the issue of unfair competition committed by the Semeraro defendants due to the actions of their agents, Defendants AAK and Kindler in this district during a hearing at which, Defendant Kindler testified pursuant to an indemnity agreement, thereby exercising some con-

trol of the presentation of the case, *Schreiber*, 327 F.3d at 185; and 4) Judge Kaplan's findings of fact on the personal jurisdiction question with respect to the unfair competition claim were necessary to support a valid and final judgment against the Semeraro defendants. *Marvel Characters*, 310 F.3d at 288–89. Since the evidentiary hearing before Judge Kaplan resulted in findings that tortious acts had been committed by Kindler and AAK in New York and resulted in a final judgment, those findings are the equivalent of a judgment on the merits. Accordingly, collateral estoppel with respect to the unfair competition claim applies.

### 2. Statute of Limitations

 Defendants' next argue that under the Lanham Act, the unfair competition claim is barred by the applicable state statute of limitations. The Lanham Act does not delineate a statute of limitations period, and a federal court "must look to the analogous State law to determine the limitations period which does best to further the policies behind the Act." *H & R Industries, Inc. v. Kirshner*, 899 F.Supp. 995, 1001 (E.D.N.Y.1995); *cf. Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir.1996). Defendants contend that the most analogous statute of limitations for common law unfair competition claims seeking damages is N.Y. C.P.L.R. § 214(4), which governs actions to recover damages for injury to property, and sets a statute of limitations of three years. (Defs.' Mem. of Law in Support of Summ. J. at 13 *citing Ediciones Quiroga, S.L. v. Fall River Music, Inc.*, 35 U.S.P.Q.2d 1814, 1821 (S.D.N.Y.1995)(RPP) (the appropriate limitations provision for the state unfair competition claim was N.Y. C.P.L.R.

11. Joseph Selig, on behalf of Plaintiff, testified on January 29, 2003 in a deposition that Lord & Taylor has about 70 stores, and that Plain-

tiff supplied coats to all of their northern stores. (Selig Dep. at 64.)

§ 214(4)); *Mopex, Inc. v. American Stock Exchange, LLC*, 2002 WL 342522, *11 (S.D.N.Y.2002) (court noted that plaintiff conceded that its unfair competition claim was akin to injury to property because "the gravamen of its claim ... is the bad faith misappropriation of a commercial advantage belonging to another ... by exploitation of proprietary information or trade secrets").) Pursuant to N.Y. C.P.L.R. § 214(4), the three year statute of limitations would have already expired as of the date of the filing of the Complaint.

In *Ediciones*, however, the state law unfair competition claim, which the Court found was akin to injury to property, was based on defendants violating a contract and openly changing the credits for lyrics to another person, and thus depriving plaintiff of the credits, not on surreptitious selling in the territory of an exclusive distributorship.[12]

Plaintiff contends that the most analogous cause of action, consistent with the policies behind the Lanham Act, is the common law fraud action, pursuant to N.Y. C.P.L.R. § 213(8) which has a statute of limitations period of six years. *See e.g.*, *H & R Industries*, 899 F.Supp. at 1002 ("policies behind the Lanham Act most closely resemble New York common law fraud"); *Charles Atlas, Ltd. v. DC Comics, Inc.*, 112 F.Supp.2d 330, 334 (S.D.N.Y.2000); *PepsiCo, Inc. v. Dunlop Tire & Rubber Corp.*, 578 F.Supp. 196, 199 (S.D.N.Y.1984) ("section 43(a) ... applies ... to those deceptive business practices which ... attempt to induce consumers to purchase an advertiser's goods by falsely passing them off" and "[s]uch claims can best be analogized to causes of actions sounding in fraud"). Under Plaintiff's argument, Defendants' actions constituting unfair competition occurring five years prior to the Complaint would be within the six year statute of limitations period.

The statute of limitations periods for unfair competition claims have "been treated disparately in New York." *Ediciones*, 35 U.S.P.Q.2d at 1821, n. 7. In this case, this Court finds that Defendants' behavior more closely resembles that of fraud rather than an injury to property, because the crux of the claim against Defendants involves the surreptitious selling by undisclosed agents of the Semeraro defendants in violation of the exclusive distributorship of Plaintiff by means of false and misleading representations made on behalf of the Semeraro defendants to Plaintiff's customers (i.e. Lord & Taylor and Bloomingdale's). Pursuant to the body of cases holding that the statute of limitations akin to New York state fraud claims of six years applies in this case, Plaintiff's unfair competition claim is not time-barred.[13]

Plaintiff's motion for summary judgment on the issue of liability for unfair competition is granted.[14]

**12.** Similarly, *Mopex* did not involve surreptitious acts. In *Mopex*, the defendant was charged with soliciting confidential disclosure of new financial trading products which were trade secrets of the plaintiff, and, without consent, embodying them in a public application to the Securities Exchange Commission to trade in such financial trading products. *Mopex*, 2002 WL 342522 at *11.

**13.** Claims under the Lanham Act are subject to principles of equity. 15 U.S.C. § 1117(a). Since Plaintiff initiated this suit in a reasonable time after final judgment was entered against the Semeraro defendants, equitable principles, rather than the statute of limitations, should be applied. *See Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1040–41 (2d Cir.1980); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf v. Steinway and Sons*, 523 F.2d 1331, 1344 (2d Cir.1975).

**14.** Plaintiff confined its argument to the Lanham Act, so this Court does not make any findings with respect to common law unfair competition.

### C. Plaintiff's Trademark Infringement Claim[15]

The Lanham Act provides in relevant part:

(1) Any person who shall, without consent of the registrant[16]—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action.

15 U.S.C. §§ 1114(1)(a) and (b). A mark is " 'use[d] in commerce'... on goods when ... it is placed ... on the goods or their containers or the displays ... or on the tags or labels affixed thereto, or ... on documents associated with the goods or their sale, and the goods are sold or transported in commerce...." 15 U.S.C. § 1127.

Judge Kaplan found that the Semeraro defendants appeared to acknowledge use of the Mario Valente label in New York, after being confronted by Plaintiff at a meeting, replying only that the labels they used were Mario Valente Italy labels, *Mario Valente*, 115 F.Supp.2d at 374, n. 37. At the hearing before Judge Kaplan, Mr. Paolo Semeraro testified and denied that such a meeting took place, but the court found Mr. Semeraro's denial of such a meeting was not credible. (*Id.*) There were no findings by Judge Kaplan, however, to suggest that the Semeraro defendants or AAK and Kindler placed the Plaintiff's trademark on goods or related labels, documents or packaging, or applied the mark or copy thereof to labels, signs or advertisements and such, intended to suggest use in commerce such that it would likely cause confusion or deceive. Although Judge Kaplan concluded that Semeraro had an "agreement with Kindler to participate in behavior that constituted trademark infringement," *Mario Valente*, 115 F.Supp.2d at 376, Judge Kaplan did not find, as Plaintiff claims, that "Defendants' acts constituted trademark infringement." (Pl.'s Mem. of Law in Opp'n and

**15.** Although Plaintiff grouped the trademark infringement claim with a tradename infringement claim in the Complaint, the tradename infringement claim would have been more properly placed within the unfair competition claim. Although tradename is defined separately in the Lanham Act as "any name used by a person to identify his or her business or vocation," 15 U.S.C. § 1127, federal tradename infringement claims are asserted under 15 U.S.C. § 1125(a). *See* McCarthy's on Trademarks and Unfair Competition, § 9:4 (McCarthy 2003). Therefore, the analysis with respect to the federal unfair competition claims applies to the federal tradename infringement claim in that they comprise the same claim, and a separate analysis of the alleged tradename infringement claim is unnecessary.

**16.** It is well established that the Lanham Act protects unregistered marks in addition to registered marks. *See, e.g., Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 120 S.Ct. 1339, 1342–43, 146 L.Ed.2d 182(2000). Indeed, Judge Kaplan rejected the Semeraro defendants' argument that the Mario Valente trademark was not protected because it was not a registered trademark. *Mario Valente*, 115 F.Supp.2d at 373.

in Supp. of its Mot. for Summ. J. at 21.) Judge Kaplan made no findings showing that the *agreement* to engage in trademark infringing behavior came to fruition, despite his findings that the actions of Kindler and AAK had caused Plaintiff injury.[17]

Accordingly, because there is no evidence to support a trademark infringement claim, and because Judge Kaplan did not make specific findings to that effect, collateral estoppel with respect to liability for trademark infringement does not apply, and Plaintiff's motion for summary judgment is denied. Because Plaintiff is relying solely on a theory of collateral estoppel for its claim of liability against Defendants and the Court has limited other liability discovery in reliance on Plaintiff's claim, Defendants' motion for summary judgement on the trademark infringement claim is granted.[18]

### Conclusion

For the foregoing reasons, Defendants' motion for summary judgment with respect to the tortious interference and trademark claims is granted and Plaintiff's cross-motion for summary judgment with respect to liability, but not damages,[19] for unfair competition is granted.

IT IS SO ORDERED.

17. The Complaint refers to Defendants selling men's overcoats to Brooks Brothers in the Spring of 1997. Judge Kaplan made no findings about that alleged sale; in this case, Kindler has admitted making such sales under the Brooks Brothers label. (Kindler Dep. at 26.)

18. Plaintiff's Complaint also seeks relief pursuant to state trademark law, but Plaintiff said nothing in its brief or at oral argument about the requirements under state law or why the claim would be valid. Accordingly, that claim is dismissed for failure to prosecute.

19. The issue of damages was not litigated before Judge Kaplan. Thus, it cannot be said that Defendants had a full and fair opportunity to litigate the issue of damages, and collateral estoppel does not apply.